19-1031(L)
*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of March, two thousand twenty-one.

PRESENT:
>>>> GUIDO CALABRESI,
>>>> RICHARD C. WESLEY,
>>>> RICHARD J. SULLIVAN,
>>>>> *Circuit Judges.*

_____

INTERNATIONAL TECHNOLOGIES MARKETING, INC.,

>> *Plaintiff-Appellant-Cross-Appellee,*

>> v.                                          Nos. 19-1031(L), 19-1297(xap)

VERINT SYSTEMS, LTD.,

>> *Defendant-Appellee-Cross-Appellant*,

VERINT SYSTEMS INC.,

       *Defendant*.[*]

_____

**For Appellant-Cross-Appellee:**       JAMES J. MAHON, Becker & Poliakoff, LLP, New York, NY.

**For Appellee-Cross-Appellant:**       HOWARD I. ELMAN (Benjamin S. Litman, Yosef Rothstein, *on the brief*), Elman Freiberg PLLC, New York, NY.

Appeal from the United States District Court for the Southern District of New York (Gregory H. Woods, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the orders of the district court are **AFFIRMED**.

International Technologies Marketing, Inc. ("ITM") appeals from the district court's dismissal of its claims for breach of contract against Verint Systems, Ltd. ("Verint") in connection with the latter's acquisition of a Brazilian telecommunications company. Verint cross-appeals the district court's denial of

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

its motions for sanctions.   We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, which are described more fully in the Court's separately issued opinion addressing Verint's cross-appeal concerning the district court's denial of Verint's request for sanctions under the district court's inherent power.   For the purposes of this summary order, we address only (i) ITM's appeal of the district court's January 27, 2016 order dismissing ITM's breach of contract claim, (ii) ITM's challenges to the court's March 15, 2019 order denying ITM leave to file a proposed fourth amended complaint, and (iii) Verint's cross-appeal of the district court's March 15, 2019 order denying Rule 11 sanctions.[1]

### *Standard of Review*

We review the district court's decision to dismiss ITM's claims *de novo*, "accepting all factual allegations in the complaint and drawing all reasonable inferences in [ITM's] favor."   *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (internal quotation marks and citation omitted).   In so doing, we may also

---

[1] ITM's opening brief states that ITM also intended to appeal the district court's January 2016 order dismissing ITM's claim for breach of the implied covenant of good faith and fair dealing. But as ITM did not develop this argument in its briefs, we deem the argument to be abandoned. *See Fabrikant v. French*, 691 F.3d 193, 202 n.8 (2d Cir. 2012).

consider documents attached to or incorporated by reference in the complaint, and documents on which ITM relied in preparing its complaint. *Id.*

By contrast, our review of the district court's decisions concerning whether to impose sanctions or permit ITM leave to amend its complaint is more deferential. In both cases, we review the district court's decisions for abuse of discretion. *See BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 859 F.3d 188, 195 (2d Cir. 2017) (leave to amend); *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143 (2d Cir. 2012) (sanctions).

## *Discussion*

### A. ITM's Breach of Contract Claim

Whether the district court correctly dismissed ITM's breach of contract claim requires us to answer two questions. First, we must determine whether ITM was acting as a "broker" or as a "finder." Second, we must decide whether the parties' contractual relationship expired on February 21, 2007 – the date provided by the parties' contract – or continued until Verint consummated its acquisition of Suntech in 2011.

Under New York law, while a finder can earn its fee merely by introducing contractual counterparties, *see Train v. Ardshiel Assocs., Inc.*, 635 F. Supp. 274, 279

4

(S.D.N.Y. 1986) (citing *Minichiello v. Royal Bus. Funds Corp.*, 18 N.Y.2d 521, 527 (1966)), a broker must bring "the parties together at mutually acceptable terms *within the period of his employment*," *Air Support Int'l, Inc. v. Atlas Air, Inc.*, 54 F. Supp. 2d 158, 167 (E.D.N.Y. 1999) (emphasis added) (quoting *Bashant v. Spinella*, 67 A.D.2d 1100, 1100 (4th Dep't 1979)). Since ITM introduced Verint and Suntech before the February 2007 expiration date in ITM's contract with Verint, whether ITM was retained as a finder or as a broker will impact whether it has earned its fee.

## 1. ITM was Hired to Act as a Broker

The parties' contract is unambiguous: ITM was hired to act as a broker. *See Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002) (noting that a court must enforce unambiguous contractual terms as written). A finder's only obligation is to "introduce and bring the parties together." *Ne. Gen. Corp. v. Wellington Advert., Inc.*, 82 N.Y.2d 158, 163 (1993). Its role therefore "cease[s]" once it introduces suitable counterparties. *Id.* at 162. That is not the job that ITM agreed to perform.

Beyond simply introducing Verint to Suntech, ITM was required to "assist and support" Verint throughout the acquisition process. J. App'x at 64 (emphasis

5

omitted). Such a role is clearly indicative of a brokerage relationship. *See Ne. Gen.*, 82 N.Y.2d at 163 (explaining that, in addition to introducing the parties, a "broker must ordinarily . . . bring the parties to an agreement").

To be sure, ITM was not given authority to negotiate on Verint's behalf, a common hallmark of brokerage relationships. *See id.* (noting that, unlike a broker, a finder has no "obligation or power to negotiate the transaction"). But that fact alone does not mean that ITM was a finder. Indeed, depending on the terms of its engagement, a broker may earn its commission simply by facilitating negotiations between two parties such that the broker is the "procuring cause" of the deal, even though it did not negotiate the deal terms itself. *See Excel Realty Advisors, LP v. Engel Burman Grp., LLC*, 134 A.D.3d 668, 669 (2d Dep't 2015) (internal quotation marks and citation omitted); *Buck v. Cimino*, 243 A.D.2d 681, 684 (2d Dep't 1997) (explaining that a broker "need not necessarily have been involved in the ensuing negotiations or in the completion of the sale" to earn its fee as the "procuring cause" of the deal).

In addition, ITM admits that its role went well beyond simply identifying acquisition candidates for Verint. For instance, ITM alleged that: Verint's acquisition of Suntech was possible only "as a direct result of [ITM's] significant

6

efforts in brokering information and possible mutual value propositions" between the merger parties, J. App'x at 144; it was "deeply engaged in facilitating" the negotiations, *id.* at 146; it "facilitat[ed] meetings between Verint and Suntech senior executives," *id.* at 155; it "coordinat[ed] due diligence sessions, and critical meetings and conference calls" between the companies, *id.*; it "participat[ed] in the negotiation and exchange of term sheets," *id.*; and it "provid[ed] indirect efforts to facilitate the Suntech [a]cquisition," *id.* Each of those obligations is inconsistent with a finder relationship, which ends when counterparties are introduced.

In sum, both the parties' contract and ITM's allegations demonstrate that ITM was required to play a role in facilitating Verint's negotiations with Suntech. Consequently, we agree with the district court that ITM was hired as a broker.

## 2. The Parties' Agreement Terminated on February 21, 2007

Since ITM was a broker and not a finder, it was obliged to bring about the Suntech acquisition during the term of its employment to earn its fee. *See Bashant*, 67 A.D.2d at 1100. We therefore must determine when that term expired. Here again, we agree with Verint and the district court.

7

The parties' initial agreement is clear that their relationship ended on February 21, 2007.   And the December 2006 amendment to that contract does not supply a different date.   So where is the ambiguity?

According to ITM, the payment provision in the December 2006 amendment (the "Payment Term") effectively nullified the contract's expiration date:

> In the event that [Verint] completes the Purchase of SUNTECH, [ITM] shall be entitled to the following compensation:
>
> (i)     With regard to the payment that may be made by [Verint] to SUNTECH at the Purchase Closing, [Verint] shall pay [ITM] 4% of . . . such payment[;]
>
> (ii)    With regard to any payment for the Purchase made subsequent to the Closing, [Verint] shall pay [ITM] 3% of any such subsequent payment . . . .

J. App'x at 64 (emphasis omitted).   As ITM sees it, the Payment Term set ITM's time of performance as the date on which Verint acquired Suntech.   And in doing so, ITM argues, the Payment Term implicitly superseded the contract's February 2007 expiration date and extended the agreement's term until whatever date Verint acquired Suntech.   But this proposed interpretation is inconsistent with the contract's unambiguous terms.

ITM's reading of the contract, that the Payment Term displaced the contract's expiration date, eviscerates the December 2006 amendment's provision

8

that, "[e]xcept as specifically included [t]here[in], *all* terms and conditions of the [initial agreement] will continue to apply between the parties." *Id.* (emphasis added). The Payment Term therefore must be given a narrower role. *See In re Viking Pump, Inc.*, 27 N.Y.3d 244, 261 (2016) (noting that an interpretation that renders certain contractual provisions surplusage "cannot be countenanced under [New York] principles of contract interpretation"). The better reading of the contract is that ITM was guaranteed its success fee at the time of closing, but only if the deal was struck before the contractual expiration date in February 2007. In other words, the Payment Term was just what that name suggests – a provision concerning when and how ITM would be paid, not an extension of the term of the parties' relationship.

As a result, because ITM was hired as a broker, and because that brokerage relationship expired in February 2007, ITM had no right to receive payment for Verint's acquisition of Suntech in 2011.

## B. ITM's Request for Leave to File a Fourth Amended Complaint

In April 2018, more than a year after the court-imposed deadline, ITM sought leave to file a fourth amended complaint. The proposed amendment asserts two claims, both of which stem from a new allegation that Verint breached

9

the parties' contract by buying a different company in early February 2007, Witness Systems, which Verint apparently knew would make acquiring Suntech all but impossible during the term of Verint's and ITM's agreement.

Typically, a party's motion to amend its complaint is governed by the liberal standard supplied by Federal Rule of Civil Procedure 15, which states that "a court should freely give leave to amend when justice so requires." *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (internal alterations omitted) (quoting Fed. R. Civ. P. 15(a)(2)). But where a party's motion to amend would require altering a court's scheduling order, the party "must satisfy *both* Federal Rules of Civil Procedure 15 and 16 to be permitted to amend." *Pasternack v. Shrader*, 863 F.3d 162, 174 n.10 (2d Cir. 2017) (emphasis added and internal brackets omitted). Under Rule 16, a court's scheduling order should "not be modified except upon a showing of good cause," which requires the moving party to have acted "diligen[tly]." *Holmes*, 568 F.3d at 334–35 (internal quotation marks and citation omitted). A lack of diligence is therefore reason alone to deny leave to amend. *See Pasternack*, 863 F.3d at 174 n.10; *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).

Here, the district court appropriately exercised its discretion in concluding that good cause did not exist to permit ITM to belatedly amend its complaint.

10

ITM's new claims are based on information that has been publicly available in Verint's SEC filings since 2007. And ITM offers no explanation for why it could not have located this publicly available (and easily accessible) information with a diligent search.

## C. Verint's Rule 11 Motion

Not content with the district court's refusal to permit ITM to file its fourth amended complaint, Verint sought sanctions under Rule 11 against ITM and its current counsel for even seeking leave in the first place. Pursuant to Rule 11, sanctions are warranted "where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification[,] or reversal of existing law." *Eastway Constr. Corp. v. New York City*, 762 F.2d 243, 254 (2d Cir. 1985) (emphasis omitted), *superseded on other grounds by* Fed. R. Civ. P. 11, *as recognized in Sorenson v. Wolfson*, 683 F. App'x 33 (2d Cir. 2017). In determining whether an argument is merely losing or whether it is both "losing *and* sanctionable, . . . courts [must] resolve all doubts in favor of the" party against whom sanctions are sought. *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (internal quotation marks and citation omitted).

11

First, Verint argues that ITM's new claims were clearly time-barred when filed. Specifically, Verint asserts that ITM's claims accrued in February 2007, meaning that the applicable six-year statute of limitations had long since lapsed by the time ITM sought leave to amend in 2018.

At a high level, ITM argues that Verint's purchase of Witness Systems constituted an anticipatory breach of the parties' agreement. In turn, ITM contends that because Verint's breach made performance by the contract's expiration date impossible, the expiration date was excused. And without an expiration date, the statute of limitations did not begin to run until Verint failed to perform its contractual obligations – that is, when Verint refused to pay ITM its contractual fee on the closing date of the Verint-Suntech acquisition.

Verint counters that this is a frivolous argument in light of caselaw holding that a "lapse of time," unlike a condition precedent, cannot be excused by a party's breach. *See Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (citation omitted). In other words, Verint argues that even if it did breach the parties' contract, the expiration date could not have been excused.

But the issue is not so cut and dried. ITM could reasonably argue that the

12

contract's expiration date was a deadline for performance. And unlike a mere lapse of time, a performance deadline is a condition precedent that can be excused by a counterparty's breach. *See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 687, 695 (1995); *Fifty States Mgmt. Corp. v. Niagara Permanent Sav. & Loan Assoc.*, 58 A.D.2d 177, 181 (4th Dep't 1977) (holding that "[o]ne who demands strict performance as to time by another party must perform on its part all of the conditions which are requisite in order to enable the other party to perform its part"). Accordingly, we cannot say that ITM's argument was so frivolous as to demand sanctions.

Second, Verint argues that ITM lied about having recently discovered the information to support its amended complaint. Specifically, Verint points out that ITM's principal, Anthony Schehtman, sent an email in 2008 attaching a Form 8-K that contained the very information that ITM claims not to have learned until 2017. Verint infers from this that ITM has known about the facts underlying its new claims for years. The district court disagreed, explaining that while "the 2007 8-K describes Verint's acquisition of Witness and the concomitant effect on its ability to acquire other companies[,] . . . the e-mail that Schehtman sent attaching the 2007 8-K is devoid of any mention of this information." *Int'l Techs.*

13

*Mktg., Inc. v. Verint Sys., Ltd.*, No. 15-cv-2457 (GHW), 2019 WL 1245013, at *8 (S.D.N.Y. Mar. 18, 2019). The district court thus gave ITM the benefit of the doubt that Schehtman simply did not read the relevant portion of the Form 8-K.

While the optics are not great for ITM, we cannot say that the district court's conclusion is an abuse of discretion. The closest Schehtman's email comes to discussing the relevant information is to reference a section in the Form 8-K that Schehtman refers to as "Cautionary Notes regarding the Financial Statement." J. App'x at 811 (internal quotation marks omitted). Verint argues that since there is no section in the Form 8-K by that name, it is possible that Schehtman meant to refer to a section titled "Cautionary Statements Related to the Acquisition of Witness," *id.* at 819, which included the relevant information. But another possibility is that Schehtman meant to refer to a section titled "Cautionary Statements Related to Our Preliminary Financial Results," *id.* at 816, which did not.

In short, the record on this issue is messy. We therefore cannot say for certain what Schehtman knew at the time he sent his email. And, as a result, we cannot conclude that the district court abused its discretion in denying sanctions.

## *Conclusion*

We have reviewed the remainder of the parties' arguments and find them

to be without merit.   For the foregoing reasons, we **AFFIRM** the orders of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court
